In re CHARLIE BISANG CHRYSLER–PLYMOUTH, INC., Bankrupt.

James A. HARRIS, Trustee, Plaintiff,

v.

CHRYSLER CREDIT CORPORATION, et al., Defendants.

Bankruptcy No. B75–1844.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Oct. 29, 1982.

James A. Harris, Marion, Ohio, Trustee in Bankruptcy.

George E. Ferstle, Toledo, Ohio, for trustee.

John W. Hilbert, II, Ray A. Farris, Fred J. Lange, Jr., Toledo, Ohio, for Chrysler Credit Corp.

Ellis F. Robinson, Ritter, Boesel, Robinson & Marsh, Toledo, Ohio, for Chrysler Motors Corp.

S. Fredrick Zeigler, Marion, Ohio, for bankrupt.

Patrick J. Foley, Asst. U.S. Atty., Toledo, Ohio, for defendants, U.S. and Dist. Dir. of Internal Revenue.

Janice Wolfe, Columbus, Ohio, for Small Business Admin.

William Kay Davis, Marion, Ohio, for defendant, Fahey Banking Co.

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

### MEMORANDUM AND ORDER [1]

The Plaintiff, Trustee in bankruptcy, filed three adversary proceedings naming, among others, Chrysler Credit Corporation (Credit), and Chrysler Motors Corporation (Motors), as the principal defendants. These actions involve the perfection of a security interest claimed by Credit in three separate groups of motor vehicles, or the proceeds of sale thereof:

1. Notwithstanding the repeal of the Bankruptcy Act under Section 401(a) of Title IV of Pub.L.No. 95–598, this case, as all cases commenced under the Bankruptcy Act, continues to be governed by its provisions pursuant to Section 403(a) of Title IV of Pub.L. 95–598.

1. 55 new and used motor vehicles sold by the Trustee for the sum of $168,089.98.

2. 7 new motor vehicles sold by the Defendant Motors for the sum of $34,200.24.

3. One (1) new motor vehicle sold on the date of bankruptcy for the sum of $4,861.74 evidenced by a certified check payable jointly to the Bankrupt and Credit.

Although the actions involve common issues of fact and law, each will be dealt with separately in this Memorandum.

The facts, as established by the testimony adduced at trial, the exhibits, and the stipulations of the parties, may be summarized as follows:

### THE 55 MOTOR VEHICLES

The Bankrupt, Charlie Bisang Chrysler-Plymouth, Inc. filed a voluntary petition in bankruptcy on December 16, 1975, and was thereupon adjudicated a bankrupt. For several years prior thereto it operated an auto dealership at Marion, Ohio, selling the Motors line of Chrysler and Plymouth automobiles. The operation was financed by Credit under a method commonly referred to as a "floor-plan", or wholesale inventory financing.

Under the arrangement, as the manufacture and assembly of automobiles ordered or otherwise designated for sale to the Bankrupt were completed, Motors would issue a Manufacturer's Statement of Origin (M.S.O.) in the Bankrupt's name, and an invoice for each automobile. Thereupon Motors would arrange for the shipment of the vehicles to the Bankrupt by common carrier. It would also mail to the Bankrupt the invoice and the M.S.O. for each vehicle. The invoice and the M.S.O. would be received by the Bankrupt either before, with, or after the delivery of the vehicles involved.

Under this procedure the Bankrupt would retain possession of the automobiles for sale to the general public, and Credit would reserve a security interest by requiring the Bankrupt to execute and deliver a wholesale Promissory Note and Trust Receipt for each vehicle delivered. Financing statements describing "new and used motor vehicles", "inventory", and "proceeds" as the covered collateral were duly filed with the County Recorder's Office and the Secretary of State. When the Bankrupt sold an automobile it was required to remit from the proceeds of the sale the invoice amount of that vehicle to Credit.

On the date of bankruptcy, the Bankrupt had possession of 55 new and used motor vehicles. It also had possession of either a M.S.O. for a new vehicle, or a certificate of title for a used vehicle, issued in its name for all of said vehicles. Upon the Trustee's Complaint and by consent of the parties these vehicles were ordered sold free and clear of liens with the proviso that all liens would attach to the proceeds, which amounts to $168,089.98.

Motors was not made a party to this action and has no interest herein.

■ Credit claims a lien in the amount of $237,887.23 by virtue of its floor-plan method of inventory financing under the provisions of the Uniform Commercial Code. Credit never had possession of the M.S.O.s or titles, nor did it cause its lien to be noted on the certificates of title.

The Trustee contends that Credit thereby failed to perfect its security interest by not complying with the provisions of the Ohio Motor Vehicle Certificate of Title Act, Chapter 4505, Ohio Revised Code. Section 4505.13 validates liens on motor vehicles if the secured party obtains and retains actual and continued possession of the M.S.O., or causes its lien to be noted upon the face of the certificate of title. The Trustee argues that Credit's failure to comply with the Statute makes its claim subordinate to the Trustee who became the hypothetical lien creditor under Sec. 70(c) of the Bankruptcy Act, the so called "strong-arm clause".

■ The question presented is whether the Ohio Motor Vehicle Certificate of Title Act prescribes the exclusive method for perfecting a security interest in inventory of new and used motor vehicles held for sale by a dealer notwithstanding Ohio's subsequent enactment of the Uniform Commercial Code. This Court holds that it does.

This is a case of first impression interpreting the applicable Ohio law on this proposition. Consideration must be given therefore to the legislative history of both Acts.

The Ohio Motor Vehicle Certificate of Title Law, Ohio Revised Code, Chapter 4505, was first enacted in 1938. *Section 4505.13, Ohio Revised Code,* prescribes the method for perfecting a security interest in motor vehicles. It was amended effective July 1, 1962, to read in relevant part as follows:

> Sections 1309.01 to 1309.50, inclusive and section 1701.66 of the Revised Code, do not permit or require the deposit, filing, or other record of a security interest covering a motor vehicle. Any security agreement covering a security interest in a motor vehicle, if such instrument is accompanied by delivery of a manufacturer's or importer's certificate and followed by actual and continued possession of such certificate by the holder of said instrument, or, in the case of a certificate of title, if a notation of such instrument has been made by the clerk of the Court of common Pleas on the face of such certificate, shall be valid as against the creditors of the debtor, whether armed with process or not, and against subsequent purchasers, secured parties, and other lienholders or claimants. All liens, mortgages and encumbrances noted upon a certificate of title shall take priority according to the order of time in which the same are noted thereon by the clerk.

On July 1, 1962, Ohio also adopted the Uniform Commercial Code, Ohio Revised Code, Title 13. *Section 1309.21, Ohio Revised Code, (U.C.C. 9–302)* in pertinent part provides as follows:

(C) The filing provisions of section[s] 1309.01 to 1309.50, inclusive, of the Revised Code, do not apply to a security interest in property subject to a statute:

(1) of the United States which provides for a national registration or filing of all security interests in such property; or

(2) of this state (including section 1701.66 of the Revised Code) which provides for central filing of, or which requires indication on a certificate of title of such security interests in such property or which requires possession of a certificate of title.

(D) A security interest in property covered by division (C) of this section can be perfected only by a registration or filing under that statute or by indication of the security interest on a certificate of title or a duplicate thereof by a public official or by otherwise complying with the procedure set forth in such statute.

It should be noted that both Sec. 4505.13 and Sec. 1309.21, Ohio Revised Code, expressly exempt security interests in all motor vehicles from the filing provisions of the Uniform Commercial Code. No attempt was made to distinguish whether or not vehicles are held as inventory. However, the drafters of the Uniform Commercial Code encouraged the states to do so. They offered two different methods for incorporating title acts into Article Nine. The official text of *U.C.C. 9–302(3), (4), (Sec. 1309.21(C), (D) Ohio Rev.Code)* reads as follows:

(3) The filing provisions of this Article do not apply to a security interest in property subject to a statute

(a) of the United States which provides for a national registration or filing of all security interests in such property; or

Note: States to select either Alternative A or Alternative B.

Alternative A—

(b) of this state which provides for central filing of, or which requires indication on a certificate of title of, such security interests in such property.

Alternative B—

(b) of this state which provides for central filing of security interests in such property, or in a motor vehicle which is not inventory held for sale for which a certificate of title is required under the statutes of this state if a notation of such a security interest can be indicated by a public official on a certificate of a duplicate thereof.

(4) A security interest in property covered by a statute described in subsection (3) can be perfected only by registration or filing under that statute or by indication of the security interest on a certificate of title or a duplicate thereof by a public official.

Under Alternative B it would appear that the Uniform Commercial Code would govern the perfection of security interests in motor vehicles held as inventory. All that would be necessary is mere notice filing of the financing statements. However, the Ohio legislature rejected this alternative and adopted Alternative A instead. By so doing it expressly excluded security interests in all motor vehicles from the filing provisions of the Uniform Commercial Code. It is therefore abundantly clear that it intended the Title Act to continue to apply to security interests in all motor vehicles whether or not held as inventory.

It should be further noted that the Ohio legislature made two additional modifications to retain the exclusiveness of the Title Act as a perfection device. To Alternative A it added: "or which requires possession of a certificate of title". To Section 4 it added: "or by otherwise complying with the procedure set forth in such statute".

Ohio's Certificate of Title law, Sec. 4505.-13, Ohio Revised Code, is unique in that it appears to be one of very few states which permit perfection of a security interest by either of two methods:

1.) Notation of lien on the Certificate of Title;

2.) Actual and continued possession of a manufacturer's or importer's certificate (M.S.O.).

By making the above modifications it is apparent that the Ohio legislature clearly

intended to continue both methods as a perfection device to the exclusion of the filing requirements of the Uniform Commercial Code.

Credit, however, contends that there is an internal inconsistency among the provisions of chapter 4505, Ohio Revised Code. Credit argues that Sections 4505.18 and 4505.05, require that the dealer must have the M.S.O. in his actual physical possession in order to display for sale or sell a motor vehicle. That on the other hand, if Credit had possession pursuant to Sec. 4505.13, the dealer would be forced to operate in violation of Sec. 4505.18(B), a penal statute, and Credit could be subject to prosecution as an aider or abettor. It further argues that since the M.S.O.s could not be in two places at the same time Credit's only alternative was notice filing as it had done.

*Section 4505.18, Ohio Revised Code,* provides in pertinent part:

No person shall:

. . . .

(B) Display or display for sale or sell as a dealer or acting on behalf of a dealer, a motor vehicle without having obtained a manufacturer's or importer's certificate or a certificate of title therefor as provided in sections 4505.01 to 4505.19, inclusive, of the Revised Code;

*Section 4505.05, Ohio Revised Code,* provides:

No manufacturer, importer, dealer, or other person shall sell or otherwise dispose of a new motor vehicle to a dealer to be used by such dealer for purposes of display and resale, without delivering to such dealer a manufacturer's or importer's certificate executed in accordance with sections 4505.01 to 4505.19, inclusive, of the Revised Code, and with such assignments thereon as are necessary to show title in the purchaser thereof. No dealer shall purchase or acquire a new motor vehicle without obtaining from the seller thereof such manufacturer's or importer's certificate.

In support of its theory Credit cites the case of *Auto Reality Service, Inc., v. Brown,* 27 Ohio App.2d 77; 272 N.E.2d 642 (1971).

It involved an informal used car brokerage scheme whereby the broker would not take title to any of the vehicles that is listed, advertised or displayed for sale. Title and ownership remained in its clients. Construing Section 4505.18, Ohio Revised Code, in a Declaratory Judgment Action, the Court held that it was designed and enacted for the purpose of avoiding or eliminating opportunities for fraud in the merchandising of motor vehicles to the public. The Court stated as follows:

With such thoughts in mind, we feel it to be in the public interest for the state to require that a commercial enterprise displaying or offering motor vehicles for sale to have title to said vehicles.

It seems to us to be in keeping with reasonably sound public policy to require such commercial enterprise to have title to automobiles with which they are dealing in a sales capacity in order that such organizations may be required to stand behind any representations made by them during the course of the sales transaction.

27 Ohio App.2d at 83, 272 N.E.2d at 646.

The case does not deal with the specific problem at issue, i.e. lien perfection, and is clearly not in point. It stands only for the proposition that the public welfare is served by a statute which requires the enterprise displaying or offering vehicles for sale to "have title to" and ownership of the vehicles to prevent fraud.

Sections 4505.05 and 4505.18, Ohio Revised Code, prohibit the display for sale "without having obtained" the certificates or M.S.O.s. They do not refer to, nor require actual continuous possession by the dealer, nor do they relate in any way to lien perfection. They are special statutes designed only to prevent fraudulent dealer practices.

On the other hand Section 4505.13 Ohio Revised Code, sets up a rule of priorities of liens which requires actual and continuous possession of the M.S.O. by the secured party, or the notation of a lien upon the certificate of title for perfection. Since the statutes are designed to accomplish differ-

ent purposes there can be no internal inconsistency or conflict compelling the Court to ignore the clear meaning and intent of Section 4505.13 which establishes the exclusive method of lien perfection.

In a parallel case, involving a question of lien priorities, the Supreme Court of Ohio resolved a similar claim of apparent conflict between the Title Act, Section 4505.13, Ohio Revised Code, and the Uniform Commercial Code Section 1309.29, Ohio Revised Code, the Artisan's Lien Statute. *See Commonwealth Loan Co. v. Berry,* 2 Ohio St.2d 169, 207 N.E.2d 545 (1965). In this case a garageman claimed a superior possessory artisan's lien, over a lien previously noted on the certificate of title, as a result of furnishing labor and material for repair of an automobile. The Artisan's Lien Statute, *Sec. 1309.29 Ohio Revised Code,* provides as follows:

> When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

In holding that the enactment of the Uniform Commercial Code was not intended to alter the well established law of Ohio as to the priority of liens upon motor vehicles the Court stated as follows:

> There is an apparent conflict as to the priority of the liens under the subject statutes. However, the General Assembly by expressly eliminating motor vehicles from the provisions of Section 1333.-41, Revised Code, by expressly excepting motor vehicles from the required filing to protect a security interest in Section 1309.21(C)(2), Revised Code, and by the amendments of Section 4505.13, Revised Code, the specific statute which deals with motor vehicle liens and which states that a lien noted upon the certificate shall be valid against other liens has made it clear that the enactment of the Uniform Commercial Code was not in-

tended to alter the well established law of Ohio as to the priority of liens upon motor vehicles.

> A special statutory provision which relates to a specific subject matter is controlling over a general statutory provision which might otherwise be applicable. *Andrianos v. Community Traction Co.,* 155 Ohio St. 47 [97 N.E.2d 549], 44 O.O. 72.

> We conclude, as did the Court of Appeals that the specific priority provided in Section 4505.13, Revised Code, prevails over the general provision of Section 1309.29, Revised Code.

2 Ohio St.2d at 170, 207 N.E.2d at 546.

In sum, the principle announced by the Ohio Supreme Court in *Commonwealth Loan Co. v. Berry, supra,* that the more specific provisions of the Ohio Motor Vehicle Certificate of Title Act are controlling over more general statutory provisions such as the Artisan's Lien Statute, is consistent with this Court's holding that Section 4505.-13 is the controlling statute in Ohio relating to the means of perfection of a security interest in a motor vehicle.

Credit further contends that it was engaged in a joint venture with the Bankrupt, and that possession of the M.S.O.s by the Bankrupt must be regarded as possession by Credit for the purposes of Sec. 4505.13, Ohio Revised Code.

The following cases are cited in support of this proposition: *Fouke v. Commercial Credit Corp.,* 116 Ohio App. 145, 187 N.E.2d 160 (Montgomery County Ct.App.1962); and *Mutual Finance Co. v. Kozoil,* 172 Ohio St. 265, 175 N.E.2d 88 (1961). The facts in both cases are similar wherein a dealer sold an automobile to the purchaser who paid cash, took possession, but never received title for it from the dealer. The cars were floor-planned by the financing agency which held possession of the M.S.O. as security. The dealer was "out of trust" by failing to remit the proceeds of prior sales to the financing agency. The financing agency used the cash from the most recent sale to pay off the liens on prior transactions and refused to surrender the M.S.O. to

the purchaser. In both cases the Court ordered the M.S.O. turned over to the purchaser. In *Mutual Finance,* 172 Ohio St. at 267, 175 N.E.2d at 90, the Supreme Court stated as follows:

Although many points have been raised by brief and argument concerning the effect of the Ohio certificate of title law on this situation, we agree that this controversy can be determined without resort to a discussion of the title law, and in that respect we agree with and adopt the following analysis of Judge Skeel in the majority opinion of the Court of Appeals:

"From the foregoing facts, aided by the provisions of the mortgage, the conclusion is inescapable that Popovic (the dealer) was acting as the agent of Mutual (the financing agency) in making this sale and collecting the money paid."

. . . .

"The Claim that the buyer must accept full responsibility under the title law by asking to see such title document before paying his money is without legal foundation upon the facts in this case. The title law was passed for the purpose of preventing fraud and deception in passing title to automobiles, not to encourage it. The purchaser, as well as the lending agency, is entitled to its benefits. Where a lending agency has full knowledge of the continued defaults of an automobile dealer with which it is associated, that is, that he is using cash received in the most recent sales to pay off floor-plan liens held by such lending agency in earlier sales transactions or where the facts are such as are so obvious that knowledge thereof must be implied, the lending agency cannot shut its eyes to reality and attempt to avoid responsibility by claiming rights or immunity under the title law."

. . . .

"It seems incredible that judicial interpretation of the motor vehicle title law should find within its provision a legislative purpose to defeat the right of an innocent purchaser for value, when the holder of the mortgage and the manufacturer's statement or certificate of origin expressly consents to exposing the automobile covered by the mortgage for sale, and actually consents to the sale, making the dealer its representative or trustee for collecting and accounting to it for the proceeds of the sale when both dealer and mortgagee are attempting to accomplish a common purpose."

■ These cases merely demonstrate that Courts will refuse to allow a financing agency to use literal compliance with the statute to enable the dealer whom it finances to perpetrate a fraud on an innocent party. The present case does not involve a third party bonafide purchaser, nor does it present a similar issue.

■ More directly in point on the issue of whether or not possession of the M.S.O.s by the Bankrupt can be considered as possession by Credit for the purpose of compliance with Sec. 4505.13, Ohio Revised Code, is the case of *In re North American Builders, Inc.,* 320 F.Supp. 1229 (D.C.Neb.1970). The State of Nebraska has a statute similar to Ohio's Sec. 4505.13 which permits perfection of security interests in motor vehicles by actual and continued possession of an M.S.O. At page 1232, the Court stated the issue as follows:

[c]an the debtor of a secured party qualify as agent for the secured party in the capacity of the possessor of the property in which the secured interest in claimed.

The Court held that for the purpose of perfecting a security interest in mobile homes manufactured by debtor and assigned to a trust, debtor corporation's president could not act as agent of the trust; that president's possession of homes and M.S.O.s was not possession of the trust, and did not give the trust possession sufficient to perfect its security interest. At page 1232, the Court referred to Professor Gilmore's work on *Security Interests in Personal Property, Vol. 1, Sec. 142, page 440 (1965)* where it is stated: 

What is "possession"? Possession is a simple concept. The Pledgee can hold the property himself or through an agent.

*The agency cannot, however, be either the debtor-pledgor or anyone under his control, since the basic pledge idea is that the pledgor must not be able to pass off the goods as his own.* (emphasis added)

Credit further contends that when a motor vehicle Certificate of Title Statute is employed as a lien perfection device, strict construction of the statute is unnecessary and the Court should apply the statute in a manner so as to reach an equitable result. Cases from other jurisdictions are cited in support of this proposition.

Before an analysis of those cases is undertaken it should be noted that all 50 states, have adopted both the Uniform Commercial Code and the Uniform Certificate of Title Act; (Louisiana did not adopt Article Nine). However, they have done so with so many variations that there still remains much confusion and lack of uniformity concerning the method, and time of commencement of lien perfection.

Twenty-two states, including the District of Columbia, have enacted Certificate of title systems that make the perfection event either the indication of the lien on the certificate of title, or the issuance of it after indication. However, the commencement of perfection varies. Some states, such as Ohio, begin perfection at the actual time of notation. Others begin at the time of the issuance of the certificate, and still others allow different periods of relation back to the date of the execution by the parties of the documents, if issuance of the title ultimately occurs. Twenty-four states have Certificate of Title laws that make mere delivery of the appropriate papers and fees to the proper officer the act of perfection, even if the certificate of title is never noted or issued thereafter. There are also differences among these states as to the time of perfection. The remaining four states require a dual system of filing a financing statement and use of a certificate of title. *See 1B, Bender's Uniform Commercial Code Service (Multi-State Motor Vehicle Transactions under the Uniform Commercial Code) Sec. 30A.05(2), pp. 30A–59.*

Credit cites the following cases in support of its argument that strict construction of Sec. 4505.13, Ohio Revised Code, is inappropriate here:

*Howarth, v. Universal C.I.T. Corporation,* 203 F.Supp. 279 (N.D.Penn.1962);

*General Motors Acceptance Corp. v. Smith,* 377 F.2d 271 (4th Cir.1967)

*In re Littlejohn,* 519 F.2d 356 (10th Cir. 1975)

*Switzer v. Carroll,* 358 F.2d 424 (6th Cir. 1966)

Prior to the Court decision in *Howarth,* supra, which involved the perfection of wholesale financing of "used car" inventory, it had already been established, that in Pennsylvania a security interest in "new car" inventory could be perfected by notice filing under the Uniform Commercial Code. This was apparently so because the Motor Vehicle Code of Pennsylvania did not require a dealer to obtain title for "new vehicles", until sale. Likewise, as to "used vehicles", since the dealer merely had to notify the Department of Motor Vehicles of the acquisition within 10 days, and was not required to apply for a new certificate of title, the Court simply held that it could perceive no good reason why the same method should not be employed for used vehicles as well.

It is obvious that Pennsylvania is not a complete Title Act state such as Ohio, and its liberal policy regarding the issuance of titles to dealers, of necessity, completely subordinates it to the U.C.C. insofar as inventory financing is concerned. As previously noted, Sections 4505.18 and 4505.05, Ohio Revised Code, require the dealer to "have title to" new and used vehicles prior to display for sale. In Pennsylvania new vehicles may be displayed for sale, and titles need not be obtained until actual sale. Likewise used vehicles could be displayed for sale and a certificate of title by the dealer was not required. This being the case notice filing under the U.C.C. was the only available method under Pennsylvania law. The *Howarth* case is clearly distinguishable on the facts and law, and the Court declines to follow any equitable principles enunciated therein.

*General Motors Acceptance Corporation,* supra, involved a defective jurat on the Bankrupt's application for a certificate of title upon which a new title was issued, and a lien noted in favor of a lender. The Trustee in Bankruptcy sought to avoid the lien. On equitable grounds the Court held that if the defective jurat was fatal to maintaining the lien it was also fatal to transfer ownership to the bankrupt and the trustee. Conversely if it did not prevent effective transfer of ownership it was not fatal to the effective maintenance of the lien recorded on the face of the same instrument; to hold otherwise would unjustly enrich the Trustee.

While the reasoning of the Court is clear, this Court fails to see any analogy to the instant case requiring the application of the equitable principle involved.

In *Littlejohn,* supra, Bankrupt purchased a new automobile from a dealer. The dealer gave the Bankrupt a bill of sale showing a lien in favor of a lender bank. To obtain an original certificate under Kansas law the purchaser was required to present to the County Treasurer: an application for an original certificate of title, the title fee, bill of sale showing the bank's lien, application for registration of the car, the registration fee, proof of payment of personal property taxes, and evidence of tax assessment of the vehicle. The Bankrupt never complied with the foregoing and no certificate of title was issued. Bankruptcy followed and the trustee argued that the lien was not perfected since it was not noted on the certificate of title. However, Kansas adopted its own peculiar version of the Uniform Commercial Code, Kan.Stat.Ann. Sec. 84 [U.C.C. 9–302(3)(c)] which allows perfection of a lien on a motor vehicle "only by presentation" of the above mentioned documents "for the purpose of such indication" with the public official. The Court held that the statutory scheme in Kansas clearly contemplated that it is the responsibility of the purchaser of a new vehicle to obtain the certificate of title; that to require the holder of a security interest to do so is an added requirement on the lienholder not contemplated by statute; and that the Kansas

Statute Sec. 84 [9 U.C.C. 302(3)(c)] "requires only tender of the appropriate documents and fee, not actual issuance". The Court concluded by stating that indication of the lien on the bill of sale was sufficient to place a potential buyer or creditor on notice of the existence of the lien. Further, that in the absence of fraud, a certificate of title, when issued, would contain a notation of the lien.

Again it should be noted that there is no similarity between the title laws of Kansas and Ohio. Kansas apparently follows the same liberal policy as Pennsylvania by not requiring the issuance of titles to dealers, but simply permits delivery of a bill of sale at time of sale. Perfection also may be accomplished without notation or even the actual issuance of an original certificate of title. It thus appears that the Certificate of Title Act in Kansas, as a lien perfection tool has been completely emasculated by the adoption of the Kansas version of perfection under the Uniform Commercial Code. Therefore, there can be no application of any principle enunciated in *Littlejohn* to the instant case.

*Switzer v. Carroll,* supra, was an automobile insurance case which involved the application of the law of Virginia, rather than Ohio, to determine the question of legal title to a motor vehicle at the time of the accident. It did not involve the question of lien priorities under Ohio law and is not pertinent.

As can be seen from the above cases cited by Credit, the question of when motor vehicle certificates of titles shall issue, or issue at all, and the mechanics for lien perfection vary from state to state. Credit's cases are all distinguishable on the facts, and the issues, and the Court declines to follow them. Furthermore, there is no claim or evidence of fraud in this case to warrant the application of equitable principles, or which compel a liberal interpretation of Ohio's lien perfection statute.

Lastly, Credit contends that to require possession of the M.S.O. by the financing agency to perfect its security interest would

unduly restrict business since a dealer cannot effectively operate without being able to quickly transfer clear title to his purchaser.

While this may be so, it is the function of the legislature to change the law if it is as burdensome as Credit suggests. On the other hand the only function of this Court is to interpret the law as enacted by the legislature in accordance with the clear meaning of the statute. At the time the Ohio legislature adopted the Uniform Commercial Code it also effectively amended Sec. 4505.-13, Ohio Revised Code, to make it clear that it did not intend to alter the well established law of Ohio as to lien perfection upon motor vehicles.

Accordingly, Credit's attempt to perfect its security interest by filing financing statements was an exercise in futility and a legal nullity. Under Section 70(c) of the Bankruptcy Act, the Trustee's lien, upon the motor vehicles and the proceeds of the sale, takes priority over Credit, an unsecured creditor.

## THE 7 MOTOR VEHICLES

In the second action the Trustee sought a turnover order against Motors for the sum of $34,200.24 which represented the proceeds of sale of 7 new motor vehicles.

Motors diverted and sold these vehicles to other dealers after the Bankrupt refused to accept delivery on December 5, 1975. The Bankrupt had ceased doing business the previous day. The sales were not completed however, until after the date of bankruptcy which followed on December 16, 1975. Of the 7 vehicles, 4 were never shipped to the Bankrupt. They remained either at Motors' factory, or at cartage yards in Detroit, Michigan. The Bankrupt obtained possession of the M.S.O.s by virtue of the computerized nature of Motors large scale automotive operation. After the vehicles were manufactured the M.S.O.s were printed by computer and immediately transmitted to the Bankrupt. At no time did the Bankrupt take possession of the vehicles.

The Trustee claimed ownership of the vehicles and entitlement to the proceeds. He argued that since the M.S.O.s were issued to the Bankrupt before the diversion and sale, title vested in the Bankrupt, and thereafter in him by operation of law. He specifically contends that title passed on the date indicated on each M.S.O., or at the latest when the vehicles were turned over to a carrier for delivery to the Bankrupt.

Motors contended that the Bankrupt's refusal to accept delivery was a repudiation of the contract of sale which revested title in Motors as seller by operation of law pursuant to the Uniform Commercial Code.

Credit claimed that under the terms of the floor-plan financing arrangement it fully paid Motors in the expectation that the Bankrupt would accept delivery, and that upon repudiation Motors held the vehicles and proceeds as agent for Credit. Credit also claimed a perfected security interest in the vehicles and proceeds.

It should be noted that in the first cause of action concerning the 55 motor vehicles the issue of the Trustee's title and ownership was never raised. That action only involved the question of lien perfection. In this action both Motors and Credit deny that title ever vested in the Bankrupt and consequently the Trustee can make no better claim.

The question of who is entitled to the proceeds of the 7 vehicles hinges on who held ownership of the vehicles on the date of the filing of the petition. Section 70a of the Bankruptcy Act, 11 U.S.C. Section 110, provides that the Trustee of the estate of a bankrupt shall be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition of all of the bankrupt's nonexempt property. 4A *Collier on Bankruptcy,* Section 70.01 at 19 (14th Ed.1978). If the bankrupt owned the vehicles on the date of the filing of the petition, the trustee is entitled to the proceeds of their sale.

Two matters need to be determined prior to deciding the question of ownership to the vehicles. First, both Motors and Credit have raised objections to the Court's exer-

cise of summary jurisdiction in this matter. In addition, it is necessary to determine whether the laws of Ohio or Michigan are controlling in the question of ownership of the vehicles.

In *Cuvrell v. Mazur (In re F & T Contractors, Inc.),* 649 F.2d 1229, 1233 (6th Cir.1981) the United States Court of Appeals for the Sixth Circuit recently had occasion to review and state the general rules relating to jurisdiction under the Bankruptcy Act of 1898:

> Jurisdiction of a court of bankruptcy is conditioned upon either consent of the defendant or possession by the court of the property which is the subject matter of the action. Bankruptcy Act Sections 2(a)(7), 23(a); *Harrison v. Chamberlin,* 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926). *See also In the Matter of Morrison v. Rocco Ferrera & Co.,* 554 F.2d 290 (6th Cir.1977); *In the Matter of Bayview Estates v. Handler,* 508 F.2d 405 (6th Cir.1974).
>
> If the property to be recovered is within the actual or constructive possession of the bankruptcy court, summary jurisdiction by such a court may be exercised even in the absence of consent by the defendant. If the bankruptcy court has neither actual nor constructive possession, the Bankruptcy Act requires that a plenary action be commenced in a United States District Court, or in an appropriate state court if an independent basis for federal jurisdiction does not exist. *In the Matter of Harold Morrison, supra,* at 297; *In the Matter of Bayview Estates, supra* at 407; 2 Collier, Bankruptcy Section 23.-05 (14th ed. 1971). (footnote omitted)

The property in question, the 7 motor vehicles or their proceeds, was in the physical possession of Motors on the date of the filing of the petition. Thus, the issues relating to jurisdiction regarding Defendants Motors and Credit concern either their consent to jurisdiction or whether the property was in the constructive possession of the bankruptcy court.

In regard to Motors' objection to jurisdiction, the Trustee contends that any rights that it had to object were waived by the failure of Motors to timely assert them. Motors contends that it has adequately raised the issue by asserting it in its pretrial brief and/or by oral motions at trial. The Court agrees with the Trustee.

Unlike Credit who raised an objection to the exercise of summary jurisdiction in its answer, Motors failed to raise any objection to jurisdiction in either its answer and cross-claim filed November 3, 1976 or its amended answer and cross-claim of December 7, 1977. The earliest that Motors could have raised an objection to jurisdiction was in its pre-trial brief filed January 25, 1977 wherein Motors, in addition to making its own arguments regarding its version of the law controlling this controversy, claims to have incorporated by reference the legal arguments of Credit relating to this group of motor vehicles, including Credit's legal arguments relating to the objection to jurisdiction asserted in its answer. Both Motors and Credit made oral objection to jurisdiction at the beginning of trial.

■ A literal application of Section 2a(7) of the Act and Rule 915 of the Rules of Bankruptcy Procedure leads this Court to the conclusion that Motors waived any grounds it may have had for objecting to jurisdiction by failing to raise them by motion or answer to the complaint. Section 2a(7) provides in relevant part that:

> Where in a controversy arising in a proceeding under this Act an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction;

This section of the Act is complemented by Rule 915(a) of the Rules of Bankruptcy Procedure which provides, with exceptions not herein relevant, that "a party waives objection to jurisdiction of an adversary proceeding in a contested matter and there-

by consents to such jurisdiction if he does not make objection by timely motion or answer, whichever is first served." Clearly then, under a literal application of Section 2a(7) and Rule 915(a), by failing to assert the defense of lack of summary jurisdiction in either its answer or amended answer, Motors waived its right to object. *See Roy v. Ellis Sarasota Bank and Trust Co. (In re Edgar)*, 617 F.2d 1171 (5th Cir.1980). *First Arlington National Bank v. Barney's Boats of Chicago, Inc. (In re Barney's Boats of Chicago, Inc.)*, 616 F.2d 164 (5th Cir.1980). *Cf. Associate Fundings, Inc. v. Phipps (In re Los Angeles Trust Deed & Mortgage Exchange)*, 464 F.2d 1136 (9th Cir.1972) (Creditor allowed to file amended answer to raise defense of lack of jurisdiction where oral objection raised at pretrial hearing shortly after filing answer).

■ As previously stated, since Credit has adequately challenged the exercise of jurisdiction by asserting it in its answer to the Trustee's complaint, and the property in question was in Motor's hands on the date of the filing of the petition, summary jurisdiction to adjudicate the Trustee's rights in the property vis-a-vis Credit can only exist if the Court can be found to have had constructive possession of the property on the date of the filing of the petition. Where property is in the possession of a third party "[t]he bankruptcy court has constructive possession of property, and summary jurisdiction over it, where the third party in possession does not assert a substantial, bonafide adverse claim to the property, but one that is merely 'colorable'." *Grover v. Palmer*, 625 F.2d 321, 323 (9th Cir.1980). *See also Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 433, 44 S.Ct. 396, 399, 68 L.Ed. 770, 774 (1924).

The Trustee maintains that Credit cannot be an adverse claimant since he holds the only recognizable evidence of ownership of the vehicles, the M.S.O.s, while Credit on the other hand, has neither the M.S.O.s, the vehicles, nor the money. Credit, as previously stated, claims ownership in the vehicles in either itself or Motors by virtue of the Bankrupt's refusal to accept delivery of the vehicles and the alleged revesting of

title in Motors pursuant to the relevant provisions of the Uniform Commercial Code. In addition, Credit claims Motors is holding the proceeds of the sale of the vehicles as Credit's agent, part of which has already been refunded to Motors.

■ Whether Credit is an adverse claimant sufficient to deny the Court summary jurisdiction depends upon whether it has raised substantial issues of law or fact relating to the Bankrupt's rights in the property in question. *See Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc.*, 668 F.2d 905 (6th Cir.1982); *Cuvrell v. Mazur (In re F & T Contractors, Inc.)*, 649 F.2d 1229 (6th Cir. 1981). This Court concludes that it has.

An analogous situation existed in *Bayview Estates, Inc. v. Bayview Estates Mobile Home-Owners Association (In re Bayview Estates, Inc.)*, 508 F.2d 405 (6th Cir. 1974). The circumstances of this case were nicely summarized in *Cuvrell v. Mazur*, 649 F.2d at 1235:

That case involved the bankruptcy of a mobile homes development coporation which became insolvent. Bayiew Estates, the debtor, developed 120 mobile home sites and attendant recreational facilities on a tract of land in Anchorville, Michigan. The tenants filed an action against the debtor, alleging that they were damaged as a result of various health and safety code violations in the park. In conjunction with the filing of the action against the debtor, the tenants began withholding their rent payments. Later, the parties agreed to a consent order which required that the tenants pay their rent into an escrow account held by the local township treasurer. After the trial began, filed a Petition for Arrangement under Chapter XI. The bankruptcy court issued an order staying the suit against the debtor and the tenants immediately discontinued making rent payments to the treasurer and began paying the same into a non-interest bearing account in the names of their attorneys. The bankruptcy court, after issuing a show cause order, determined that it had jurisdiction in a

summary proceeding to determine rights as to the escrowed funds. The tenants appealed to the district court, which held that the escrowed funds were not subject to the summary jurisdiction of the bankruptcy court. The debtor then appealed the district court's decision. This court first noted that the test of the bankruptcy court's jurisdiction was 'not title in but possession by the bankrupt at the time of the filing of the petition in bankruptcy.' *Id.* The Court then concluded that neither the debtor nor the receiver ever had physical possession of the funds, and the township treasurer was not a bailee or an agent of the debtor. Therefore, the debtor did not have actual or constructive possession of the escrow account.

Similarly, in the present case, neither the Trustee nor the Bankrupt ever had physical possession of the vehicles or the proceeds of their sale. A substantial question of law has been raised as to the rights to the funds represented by the proceeds which, if decided in favor of Motors or Credit, would result in a transfer of the fund in Motors' possession to Credit. Despite Motors inadvertent consent to jurisdiction then, this Court lacks summary jurisdiction to decide the Trustee's rights in the fund vis-a-vis Credit. The Court will proceed then, only to decide the question of the respective rights of Motors and the Bankrupt to the vehicles involved.

The Trustee's first cause of action involved the question of the perfection or non perfection of Credit's security interest in the 55 motor vehicles. Resolution of that issue was accomplished by exclusive reference to the laws of Ohio since that was the state where the collateral was located and the only state where perfection was attempted.

As previously discussed, resolution of that issue required reference therefor to the Ohio Motor Vehicle Certificate of Title Law. In contrast, the present cause involving the 7 vehicles primarily involves the question of title or ownership to the vehicles which, due to a provision in the Direct Dealer Agreement (D.D.A.) between the

Bankrupt and Motors, raises a question whether the Ohio or Michigan version of the Uniform Commercial Code (U.C.C.) is controlling. While the Court is of the opinion that the provision in paragraph 30 of the D.D.A. that "[t]his agreement will be interpreted and sustained according to the laws of the State of Michigan" should be effective to require the Court to apply Michigan law to determine the questions involved in the Trustee's second cause of action, see *Nederlandse Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp.,* 466 F.Supp. 846 (E.D.N.Y.), aff'd 614 F.2d 1289 (2nd Cir.1979); *Gannett Co. v. Register Publishing Co.,* 428 F.Supp. 818 (D.Conn. 1977), the fact that both Ohio and Michigan have enacted virtually identical versions of the Article 2 of the Uniform Commercial Code, and the absence of any apparent differences in construction given these provisions by the Court's of the respective jurisdictions, this Court will permit reference by number to the general provisions of Article 2 of the U.C.C. throughout the opinion. *See In re Barney Schogel, Inc.,* 12 B.R. 697 (Bkrtcy.S.D.N.Y.1981).

The parties have raised a multitude of issues relating to their respective interests in the 7 motor vehicles involved in the Trustee's second cause of action. Two questions seem to be of primary importance: first, the question of whether the Bankrupt, or the Trustee, ever held title or right to the vehicles in question; second, whether any title or right acquired by the Bankrupt revested in Motors by operation of law pursuant to 2–401(4) U.C.C. Since the Court is of the opinion that resolution of these questions is determinative of the parties rights, it will not discuss the myriad other issues raised in the voluminous briefs filed by the parties in this case.

■ With respect to the question of whether title to the vehicles ever vested in the Bankrupt, the Trustee relies on the provisions of the U.C.C. governing passage of title, certain provisions in the D.D.A., and language in the M.S.O.s in contending that title to the vehicles vested in the Bankrupt no later than the time the vehicles

were delivered to the carrier at the point of shipment, or alternatively, when the "transfer" occurred as indicated on the face of the M.S.O.s. The Court agrees with the former result.

Section 2–401(1) of the U.C.C. provides that [s]ubject to these provisions . . . "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties". Thus, under the governing law, the parties are free to choose for themselves the circumstances under which title passes.

Paragraph 16 of the D.D.A. provides: "[t]itle to Products CHRYSLER sells to DIRECT DEALER hereunder will pass on delivery of the products to DIRECT DEALER, DIRECT DEALER'S agent, or the carrier." Pursuant to paragraph 11 of the D.D.A. Motors has broad discretion regarding the precise method and location of delivery.

> CHRYSLER may deliver passenger cars by rail, haulaway, boat, or any other means of transport, or deliver them for driveaway, endeavoring when exceptional circumstances arise and the cost is not increased to meet DIRECT DEALER'S preference as to mode of transportation. CHRYSLER may deliver passenger cars to a carrier that CHRYSLER selects, consigned to DIRECT DEALER at DIRECT DEALER'S place of business or consigned to the city or town where DIRECT DEALER'S place of business is located (or to the nearest practicable unloading point) "to CHRYSLER'S order, notify DIRECT DEALER", or may deliver them to DIRECT DEALER at the factory, or at any other point that CHRYSLER may establish.

At the earliest, under this agreement, title passes when Motors delivers vehicles to the carrier of its choice. Furthermore, the "carrier" under this language has been held to be the intermediate carrier responsible for picking up vehicles at the factory and delivering them to the long distance hauler. See Nichol v. El Par Motor Sales, 45 Mich. App. 426, 206 N.W.2d 790 (1973).

The Trustee alternatively relies on language in the M.S.O.s themselves that specifies a "transfer" date for a particular vehicle as governing the time of passage of title. Since the M.S.O.s were received by the Bankrupt irregularly, sometimes before, sometimes with, and sometimes after delivery of the vehicles, although the "transfer" date on the M.S.O. certainly closely evidences the time title passed, the time of actual delivery to the carrier, in the Court's opinion, more nearly comports with the terms of the parties' agreement and normal commercial practice. For present purposes, then, title passed upon physical delivery of the vehicles to the carrier chosen by Motors.

■ More important, perhaps, are events which occurred on December 5, 1975 relating to three of the vehicles in question. From the evidence adduced at trial, it is apparent that on this day the Bankrupt, in the presence of representatives of Motors and Credit, declined to accept delivery of three vehicles brought onto the dealership premises by the longdistance carrier. Further, the Bankrupt made arrangements with these representatives to divert or stop any further shipments of vehicles in transit or on order from Motors. Motors contends that this can be construed to have been "a rejection or other refusal by the buyer to receive or retain goods" under Section 2–401(4) U.C.C. resulting in a revesting of title to the 7 vehicles in Motors by operation of law. This Court agrees.

Section 2–401(4) provides:

> A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".

Under Section 2–301 "[t]he obligation of the seller is to transfer and deliver and that of the buyer to accept and pay in accordance with the contract." "Tender of delivery is a condition to the buyer's duty to accept the goods" and "entitles the seller to acceptance of the goods". Section 2–507(1) U.C.C. The seller, Motors, tendered delivery by putting and holding conforming

goods at the buyer's disposition, Section 2–503(1) U.C.C. This was done on December 5, 1975 when Motors caused goods to be delivered at the Bankrupt's place of business. The Bankrupt's refusal to keep the goods delivered on that date and the notification of the same to seller's representative on his premises that day, see 2–602(1) U.C.C., in this Court's opinion, constituted a sufficient "rejection" or "refusal" under Section 2–401(4) U.C.C. thereby revesting title in Motors by operation of law. See Amoco Pipeline Co. v. Admiral Crude Oil Corp., 490 F.2d 114 (10th Cir.1974).

In opposition to this analysis, the Trustee raises two arguments against application of Section 2–401(4) to the transaction in issue. First, the Trustee would argue that Section 2–401(4) cannot be applied to revest title in Motors by operation of law since the Bankrupt had fully performed by receiving the vehicles through the carrier and by having made payment to Motors through its arrangement with Credit. Second, the Trustee contends that Section 2–401(4) cannot govern the transaction in issue since it conflicts with the more specific provisions of Section 4505.04 O.R.C. dealing with title to motor vehicles.

The argument that the Bankrupt had fully performed by receiving the vehicles through the carrier and causing the purchase price to be paid through its arrangement with Credit evidences both a misunderstanding of the Code's definition of "acceptance" on the one hand, and an unduly narrow and technical interpretation of its remedial provisions on the other. Section 2–606 provides the U.C.C. definition of acceptance,

(1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

While the Trustee would somehow argue that receipt of the goods by the carrier was an acceptance of the goods not only does this overlook Section 2–606(1)(a)'s requirement that buyer signify that the goods are conforming after a reasonable opportunity to inspect but totally ignores the Bankrupt's rejection of the goods. Thus, even assuming the validity of the argument that Section 2–401(4) does not apply when buyer fully performs, the failure of the Bankrupt to accept the goods in this case negates its application.

■ Second, there is simply nothing in the provisions of Section 2–401, or elsewhere in the U.C.C. that would rule out Section 2–401's application where the buyer paid for the goods. Indeed, this seems contra to Section 1–106(1)'s admonition that "[t]he remedies provided by this Act shall be liberally administered" which the Official Comment indicates was "intended to negate the unduly narrow or technical interpretation of some remedial provisions of prior legislation." In sum, application of Section 2–401(4) is proper even if seller has been paid and has not refunded the purchase price.

■ The Trustee next argues that Section 4505.04, specifically dealing with motor vehicles, governs over the more general provisions of Article 2 of the U.C.C. on sales and that, resultingly, the Bankrupt's possession of the M.S.O.s demands recognition of his title to vehicles as the Bankrupt's successor in interest. Section 4505.04 provides in part:

No court in any case at law or in equity shall recognize the right, title, claim or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:

(A) By a certificate of title or a manufacturer's or importer's certificate issued in accordance with sections 4505.01 to 4505.19, inclusive, of the Revised Code.

Literal application of Section 4505.04 O.R.C. in every circumstance, however, would lead to the untenable result that the claim of the holder of the M.S.O. would prevail even in cases of fraud or theft. Furthermore, any perceived inconsistency between the Sales Act and Ohio's Certificate of Motor Vehicle Title Law, Section 4505.01 et seq., ignores the latter's specific recognition that ownership of a motor vehicle may change by operation of law regardless of who maintains possession of a certificate of title or M.S.O. Section 4505.10 provides in relevant part:

> In the event of the transfer of ownership of a motor vehicle by operation of law, as upon inheritance, devise or bequest, order in bankruptcy, insolvency, replevin, or execution sale, or whenever the engine of a motor vehicle is replaced by another engine, or whenever a motor vehicle is sold to satisfy storage or repair charges, or repossession is had upon default in performance of the terms of a security agreement as provided in sections 1309.01 to 1309.50, inclusive, of the Revised Code, the clerk of the court of common pleas of the county in which the last certificate of title to said motor vehicle was issued, . . . may issue to the applicant a certificate of title to such motor vehicle. (Emphasis added)

In conclusion, in this Court's opinion, neither Motors' failure to refund to the Bankrupt the purchase price of the vehicles nor Ohio's Certificate of Motor Vehicle Title Law present any obstacle to Section 2–401(4)'s operation in revesting title to the vehicles in question by operation of law. The Bankrupt's refusal to accept the three vehicles delivered on December 5, 1975, and the arrangement made with Motors to divert any further shipment of vehicles, operated to revest title in Motors.

As a final matter, Motors has counter-claimed against the Trustee for the additional transportation expenses incurred as the result of the Bankrupt's refusal to accept delivery of the vehicles and the resultant necessity to reship certain of the vehicles to other dealers for sale. The parties have stipulated that the amount of these expenses total $601.00. Since it appears that Motors is entitled as an aggrieved seller under Section 2–710 U.C.C. to incidental damages for expenses incurred in transportation of goods after a buyer's breach in connection with the return or resale of goods resulting from the breach, Motors will be granted judgment for this amount on its counter-claim.

### THE CERTIFIED CHECK

The Plaintiff/Trustee's third cause of action is a complaint for turnover of a certain certified check issued by Eshelman Chrysler-Plymouth, Inc. on December 16, 1975 and made jointly payable to the Bankrupt and Credit. Advancing the arguments set forth previously in his first and second causes of action, the Trustee maintains that the check, as proceeds of the sale of a motor vehicle for which he assertedly held title and ownership by virtue of his possession of the M.S.O., was property of the Bankrupt which was never subject to the security interest claimed by Credit. Alternatively, the Trustee claims the status of a holder in due course of the instrument represented by the check and therefore, claims to be entitled to priority over any security interest claimed by Credit pursuant to Section 1309.28 O.R.C. (U.C.C. 9–309). Credit on the other hand, claims a perfected security interest in the check as proceeds of the sale of a motor vehicle covered by its financing statements filed in accordance with Chapter 1309 O.R.C.

Notwithstanding the Court's previous holding in the Trustee's first cause of action that the provisions of the Ohio Motor Vehicle Certificate of Title Act, Section 4505.13 R.C., permits perfection of a security interest in a motor vehicle exclusively by either notation of lien on a certificate of title or actual or continual possession of a M.S.O., this Court holds that, by making the appropriate filings under Chapter 1309 O.R.C., Credit has validly perfected a security interest in the proceeds of a motor vehicle by the only means available to it under Ohio law. Under the circumstances of this case,

the security interest being perfected prior to the filing of the bankruptcy petition, the Trustee is unable to avoid Credit's interest under his Section 70(c) powers.

The vehicle in question was one of three attempted to be delivered to the Bankrupt's automobile dealership on December 5, 1975. As previously discussed in relation to the Trustee's second cause of action, these vehicles were refused when delivery was tendered at that time. Subsequently, a field representative of Motors, on the premises of the Bankrupt at that time, arranged for a diversion of the vehicle involved to Eshelman Chrysler-Plymouth, Inc. (Eshelman) of Delaware, Ohio for storage. This was done to eliminate the need for the carrier to return the vehicles to Motors which would necessitate reshipment of the vehicles, at additional expense, to another dealer.

When the vehicle in question was delivered to Eshelman later on December 5, 1975, the carrier's delivery receipt was signed by John W. Eshelman, President of Eshelman, with the notation "Accepted for Bisang C/P (Per. Jim Cross) For Storage Only". The evidence adduced reveals that this provision was added in accordance with the customary practices between Motors, and a dealer storing an automobile for Motors and not for resale, for the purpose of limiting the storing dealer's liability for the vehicle while it was on his premises.

Later, on or about December 9, 1975, to accommodate a customer of the Bankrupt who had ordered the vehicle in question without tendering any advance payment, Mr. Bisang, who was in possession of the M.S.O. for the vehicle, executed an assignment of the M.S.O. for the vehicle in order to expedite delivery of the vehicle to the customer. This procedure was undertaken in lieu of the formal diversion process involving a reissuance of the M.S.O. by Motors, a process taking a month's time, to prevent delay and the consequent possibility of loss of the sale to the customer involved.

On advice of representatives of Motors, Mr. Eshelman, in exchange for the M.S.O. transferred to him by the Bankrupt, executed a check for the invoice price of the vehicle involved naming the Bankrupt and Credit as joint payees. The check was delivered to the Bankrupt's president on December 16, 1975 before the filing of the petition. This check was signed by the Trustee and forwarded to counsel for Credit in an attempt to secure the necessary endorsements required by the drawee bank to negotiate the check. Unexpectedly, the check was never signed by any representative of Credit. Instead, it was held by Credit resulting in the present complaint for turnover.

The check in issue having been in the Bankrupt's possession on December 16, 1975, the date of the filing of the petition, the issues relating to the respective interests of the Bankrupt and Credit in the check turn, in the first instance, on the question of whether Credit had perfected a security interest in the check. If it did it is entitled to negotiate the check free of any claim to it by the Trustee.

In contrast to the question involved in the Trustee's first cause of action where the Court upheld the use of the Trustee's avoiding power due to Credit's failure to have and maintain possession of the M.S.O.s for the *automobiles* involved or to note its lien on a certificate of title for the *automobiles* in question, this case concerns the question of the perfection or nonperfection of Credit's interest in the *check* or "cash proceeds" under Section 1309.25(A) O.R.C. [U.C.C. 9–306(1)] of the sale of the vehicle in question by Eshelman. Under Section 1309.25(D)(3) O.R.C. [U.C.C. 9–306(4)(c)] if Credit has a perfected security interest in proceeds it has a perfected security interest in these insolvency proceedings since the check is an identifiable cash proceed not deposited in a bank account prior to Bankruptcy.

The Trustee maintains that since the financing statement involved is, by its terms, only effective against "all proceeds covered by this statement" and that, as indicated previously, the filing was ineffective to perfect Credit's security interest in the automobiles as collateral, the filing is similarly ineffective to perfect a security interest in the check or proceeds of the collateral.

Stated differently, since the vehicles as the collateral were not "covered" by the statement, the Trustee would argue, neither was the check or proceeds. Credit contends that the coverage of the financing statement in question should not be so narrowly construed and that notice filing under Chapter 1309 O.R.C. (Article 9 U.C.C.), being the only available means of perfecting a security interest in cash proceeds of inventory in Ohio, Credit's claim of a perfected security interest in the proceeds of the car should be upheld. This Court agrees.

Under the 1962 version of Section 1309.-39(A) O.R.C. [U.C.C. 9–402(1)] "[a] financing statement is sufficient if it . . . contains a statement indicating the types, or describing the items, of collateral." Division E of that same section [U.C.C. 9–402(5)] provides that "[a] financing statement complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." As Comment 2 to this section indicates:

> This section adopts the system of "notice filing" which has proved successful under the Uniform Trust Receipts Act . . . *The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described.* Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. (Emphasis added)

Furthermore, Section 1309.08 O.R.C. (U.C.C. 9–110) provides that "any description of personal property . . . is sufficient whether or not it is specific if it reasonably identifies what is described."

■ In this Court's view the financing statement in issue adequately describes the collateral in which Credit purported to have perfected a security interest. It indicated merely that Credit may have had a security interest in the collateral described and, by virtue of additional language in the financing statement, and checking of the box indicating that proceeds of collateral are covered, that it also claimed a security interest in the proceeds of that collateral. The fact that the financing statement was insufficient, under this Court's prior holding, to perfect a security interest in the vehicles themselves should not therefore preclude Credit from perfecting its security interest in the proceeds of those vehicles by the only method available under Ohio law. The vehicle having been converted to proceeds prior to the filing of the petition in this case, Credit's security interest was perfected at that same time and, therefore, is not subject to the Trustee's Section 70(c) "strong arm" powers.

■ Last of all, the Trustee claims some protection from Credit's security interest in the check under Section 1309.28 O.R.C. (U.C.C. 9–309) by asserting the status of a "holder in due course" under Section 1303.-31 O.R.C. (U.C.C. 3–302). Whatever protection Section 1309.28 provides a holder in due course, however, is unavailable to the Trustee since the evidence, in this Court's opinion, clearly reflects the Bankrupt's and Trustee's knowledge of Credit's claim to the check, which, pursuant to Section 1303.-31(A)(3) [U.C.C. 3–302(1)(c)] would negate its asserted status as a holder in due course.

In sum, Credit has a validly perfected security interest in the check in issue and, by virtue of its present possession of the check and the endorsement previously supplied by the Trustee, should be free to negotiate the check free of any claim of the Trustee.

For the foregoing reasons, it is hereby,

ORDERED ADJUDGED, AND DECREED that the Trustee be entitled to the proceeds of the sale of the 55 new and used motor vehicles sold by the Trustee for the sum of $168,089.98 free and clear of any claimed security interest of Chrysler Credit Corporation and all other defendants herein. It is further,

ORDERED that the Trustee's complaint for turnover of the 7 new motor vehicles sold by the Defendant Chrysler Motors Corporation for the sum of $34,200.24 be dismissed as against Chrysler Credit Corporation for lack of jurisdiction. It is further,

ORDERED that the Trustee has no right, title, or interest in the 7 motor vehicles sold

by Chrysler Motors Corporation for the sum of $34,200.24, and Trustee's Complaint for Turnover against Defendant Chrysler Motors Corporation, for said proceeds be, and hereby is, dismissed. It is further,

ORDERED that Chrysler Motors Corporation is granted judgment against the Bankrupt for $601.00 as incidental damages incurred in transportation of certain vehicles which were not accepted. It is further,

ORDERED that Defendant Chrysler Credit Corporation be held to have the first and best lien on the certified check for the sum of $4,861.74 payable jointly to the Bankrupt and Chrysler Credit Corporation and that Chrysler Credit Corporation is entitled to negotiate said check free and clear of all claims of the Trustee and all other Defendants herein.